UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT BECKLEY

STARR INDEMNITY & LIABILITY COMPANY,

        Plaintiff,

v.                                  CIVIL ACTION NO.   5:23-cv-00762

ASCOTT RESOURCES LLC,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

        Pending are Plaintiff Starr Indemnity & Liability Company's ("Starr") Motion for Summary Judgment [ECF 55], filed July 17, 2025, and Defendant Ascott Resources LLC's ("Ascott") Motion for Partial Summary Judgment [ECF 57], filed July 18, 2025. Ascott responded in opposition [ECF 60] to Starr's motion on July 31, 2025, to which Starr replied [ECF 62] on August 8, 2025. Starr responded in opposition [ECF 59] to Ascott's motion on July 29, 2025, to which Ascott replied [ECF 61] on August 5, 2025.

**I.**

        Starr is a property and casualty insurance company incorporated in Texas with its principal place of business in New York. Ascott is a West Virginia limited liability company whose sole member is Jerry Scott II, a West Virginia citizen. This action involves unpaid premiums for three insurance contracts issued to Ascott by Starr. The jurisdictional amount is satisfied inasmuch as Starr seeks $2,485,253.83. [ECF 29 at 8]. *See Navy Fed. Credit Union v. LTD Fin. Servs., LP,*

972 F.3d 344, 352 (4th Cir. 2020) ("[T]he 'matter in controversy' must 'exceed[ ] the sum or value

of $75,000.' And . . . the controversy must arise between 'citizens of different States.'") (first

quoting 28 U.S.C. § 1332(a); and then quoting § 1332(a)(1)).

### A.    *Formation of the Contracts*

On April 1, 2022, Starr issued Ascott a workers' compensation and employer's

liability insurance policy (policy number 1000004956) covering April 1, 2022 to April 1, 2023

(the "2022 WC Policy"). [ECF 55-1 at ¶¶ 5–9, ECF 55-6 (2022 WC Policy)]. On January 30, 2023,

Ascott's insurance broker, USI Insurance Services, LLC ("USI") submitted a "renewal application

to Starr for workers' compensation insurance." [ECF 55-1 at ¶16; ECF 57-1 Ex. 2]. On March 13,

2023, Starr sent USI the requested renewal quote. [ECF 55-8; 57-1 Ex. 2]. After renegotiations

regarding the terms of a renewal, on March 31, 2023, Ascott's insurance broker emailed Starr,

"Please bind the 4/1 Work Comp Renewal per the attached quote." [ECF 55-10]. Thereafter, the

2022 WC Policy renewed for the term April 1, 2023 to April 1, 2024 (the "2023 WC Policy")

[ECF 55-1 at ¶¶ 16–22; ECF 55-11 (2023 WC Policy)].

Starr alleges Ascott also requested a "deductible liability protection policy, under

policy number 1000090767231, that covered the term April 1, 2023 to April 1, 2024 (the "2023

DLP Policy")." [ECF 29 at ¶ 14]. According to Starr, as a result of Ascott's request for the 2023

DLP Policy, "Starr proposed a workers' compensation policy with a $100,000.00 deductible, plus

a deductible liability protection policy to cover the losses within deductible." [ECF 55-1 at ¶ 18].

And, on March 28, 2023, Starr "sent USI an updated proposal for the requested insurance policy,"

which included "added . . . forms to the deductible buyback section." [ECF 55-1 ¶ 19; ECF 55-

10]. Thereafter, "[o]n March 31, 2023, Starr received an email from USI directing it to bind

2

coverage as set forth in the quote contained in the March 28, 2023 email." [ECF 55-1 ¶ 21; *see also* ECF 55-10].

Yet, according to Ascott, "internal emails indicate that it was Starr who wanted this DLP policy." [ECF 58 at 2; ECF 57-1, Ex. 2]. According to Ascott, "with coverage under the 2022 WC Policy expiring on April 1, 2023, Ascott was presented with an insurance proposal dated March 30, 2023." [57-1, Ex. 3]. Further, while the "proposal [sent by Starr] included the Proposed 2023 DLP Policy, on the 'Client Authorization to Bind,' [form], [Ascott] specifically asserts that only the '4/1/2023 Work Comp Renewal' was authorized to bind." [ECF 58 at 2 (quoting ECF 57-1, Ex. 3)]. The Client Authorization to Bind form was signed by Ascott on March 31, 2023, the day before coverage for the 2022 WC Policy was expiring. [ECF 57-1, Ex. 3; ECF 55-10]. Ascott emailed the Client Authorization to Bind form to USI on March 31, 2023. [ECF 55-10]. USI thereafter emailed Starr, stating "Please bind the 4/1 Work Comp Renewal per the attached quote." [*Id.*]. Thereafter, Starr issued Ascott both the 2023 WC Policy and the 2023 DLP Policy. [ECF 55-6].

**B.    *Premium Audits and Amounts Due***

The following are undisputed facts: (1) at policy inception, Ascott was expected to pay an estimated premium, (2) the ultimate premium was subject to final determination after the end of the policy term, and (3) the policies provided for an audit noncompliance charge in the amount of twice the estimated premium. [*See* ECF 55-1 ¶¶ 11–14, 23–26, 28–31; ECF 55-6 (2022 WC Policy); ECF 55-11 (2023 WC Policy); ECF 55-12 (2023 DLP Policy); 57-1, Ex. 1, 4, 5, 8]. At least with respect to the 2022 WC Policy and the 2023 WC Policy, Ascott agreed to remit payment of premiums and surcharges, including audit premiums, in consideration for Starr's

provision of insurance coverage. [ECF 55-6; ECF 55-11; ECF 55-12]. Starr fulfilled its contractual obligations and provided the insurance coverage afforded by the policies. [ECF 55-1 ¶ 34]. Starr, however, ultimately cancelled both the 2023 WC Policy and 2023 DLP Policy for premium nonpayment, effective June 6, 2023. [ECF 55-1 ¶ 32; ECF 55-13 (notices of cancellation of insurance); 57-1, Ex. 6 (notices of cancellation of insurance)].

Starr conducted audits of the policies between May 2023 and September 2023. [ECF 55-1 ¶¶ 15, 27; ECF 55-6; ECF 55-11; 55-14 (declaration of Starr's auditor); ECF 57-1, Ex. 10, 11, 12]. In April 2024, after receiving further financial information from Ascott, Starr computed the audit premium due pursuant to the 2022 WC Policy and removed the audit noncompliance charge. [ECF 55-19 ¶ 22]. In July 2024, Ascott disputed the amount due and provided a spreadsheet of its employees to Starr in support of the dispute. [*Id.* ¶ 24]. Starr then revised the audit regarding the 2022 WC Policy as well as the 2023 WC Policy consistent with the spreadsheet provided by Ascott. [*Id.* ¶¶ 25–26].

Nevertheless, the parties dispute whether Ascott cooperated with Starr's audit and the subsequent effect of the alleged noncompliance on Ascott's numerous calculations regarding the total final premium due. According to Starr, Ascott failed to provide necessary documents and information for Starr to perform the audit between May 2023 and early September 2023. [ECF 55-14; ECF 55-19]. According to Starr, it applied the audit noncompliance charge to the 2022 WC Policy and 2023 WC Policy in September 2023 and sent the audit packages to USI for forwarding to Ascott. [ECF 55-19 ¶¶ 7–8; ECF 55-20; ECF 55-21]. Starr's position is that Ascott failed -- at least until March 2024 -- to submit information necessary for Starr to conduct the audit. [ECF 55-14 ¶¶ 5–8].

According to Ascott, Starr had all the necessary materials to complete the audits

4

from when Ascott previously provided financial records during the negotiation of the 2023 WC Policy and from the materials provided in August 2023. [ECF 57-1, Ex. 9, 10, 11, 12]. Nevertheless, according to Ascott, for the 2022 WC Policy, Starr sent five invoices reflecting different amounts between April 2, 2024, and November 25, 2024, without explanation for the changing amounts. [ECF 57-1, Ex. 22, 23, 24, 25, 27]. For both the 2023 WC Policy and the 2023 DLP Policy, Starr sent three invoices reflecting different amounts owed for the policies between September 23, 2024, and December 4, 2024, with still different calculations regarding the final premiums due reflected in Starr's December 12, 2024, Motion for Leave to File an Amended Complaint. [*Id.*, Ex. 26, 28, 29; ECF 29].

According to Starr, the final amount due for the 2022 WC Policy is $2,034,866.00 pursuant to its November 25, 2024, invoice, [*Id.* ¶ 32; ECF 55-25]; the amount due for the 2023 WC Policy is $347,533.00, [ECF 55-19 ¶ 33; ECF 55-26], pursuant to its September 23, 2024, invoice; and the amount due for the 2023 DLP Policy is $102,857.01, pursuant to the September 23, 2024, invoice. [ECF 55-19 ¶ 33; ECF 55-26]. Starr admits that, as a result of a billing error, it mistakenly advised Ascott on September 24, 2024, that Ascott owed a remaining $127,139.01. [ECF 55-19 ¶¶ 29–31].

## C. *Procedural History*

On November 28, 2023, Starr instituted this action, alleging breach of contract (Count I) as a result of Ascott's nonpayment of amounts due under the 2022 WC Policy, the 2023 WC Policy, and the 2023 DLP Policy as well as unjust enrichment (Count II) resulting from Starr's provision of coverage pursuant to the policies for which Ascott did not pay. [ECF 1].

On January 21, 2025, the Court authorized [ECF 28] Starr to file an Amended

Complaint [ECF 29] alleging the same claims but reflecting the newly calculated premiums subsequent to the audits conducted with the benefit of the information provided by Ascott to Starr in April and July 2024. On February 4, 2025, Ascott answered, asserted two counterclaims alleging common law bad faith (Count I) and a violation of the West Virginia Unfair Trade Practices Act ("WVUTPA") (Count II), and asserted multiple affirmative defenses. [ECF 32]. On February 14, 2025, Starr filed an Answer to Ascott's counterclaims and asserted estoppel as an affirmative defense. [ECF 33].

On July 17, 2025, Starr moved for summary judgment on its breach of contract (Count I) claim as well as on Ascott's bad faith (Count I) and WVUTPA counterclaims (Count II). [ECF 55]. The Court construes Starr's motion for summary judgment as a motion for partial summary judgment inasmuch as Starr's motion fails to mention its unjust enrichment (Count II) claim. *See* Fed. R. Civ. P. 56(f); *Moore v. Equitrans, L.P.*, 27 F.4th 211, 224 (4th Cir. 2022). Regarding the breach of contract claims, Starr asserts there are no genuine issues of material fact and summary judgment is proper inasmuch as "the contracts are the policies, . . . Ascott breached the insurance contracts (i.e., the Policies) by failing to pay the additional premium[s] owed after the audits[,] . . . and Starr has been damaged by the unpaid premium[s] owed by Ascott after the audits in the total amount of $2,485,256.01." [ECF 56 at 7]. Moreover, Starr contends the audits were properly conducted in accordance with the policies and that summary judgment should be granted on Ascott's counterclaims inasmuch as Starr did not "act[] in bad faith by seeking to collect the premium due" and it "did not engage in unfair trade practices." [*Id.* at 7–12].

In response, Ascott contends, *inter alia*, that Starr's motion must be denied based upon genuine issues of material fact regarding the breach of contract claims, including whether a contract existed on the 2023 DLP Policy and the amounts owed pursuant to the policies. [ECF 60

6

at 2–9].

On July 18, 2025, Ascott moved for partial summary judgment on its counterclaims for bad faith (Count I) and WVUTPA violations (Count II). Ascott asserts Starr breached the common law duty of good faith and fair dealing and violated the WVUTPA by (1) attempting to collect a premium on the 2023 DLP Policy despite Ascott neither seeking the policy nor authorizing USI to bind it, (2) "failing to accurately determine the amount allegedly owed" to Starr while still seeking incorrect premium charges from Ascott, (3) issuing the erroneous audit noncompliance charge, and (4) making "misrepresentations as to the terms and conditions of the insurance policy." [ECF 58 at 9–16].

In response, Starr contends, *inter alia*, that Ascott's motion must be denied inasmuch as (1) West Virginia does not recognize an independent claim asserting a breach of the common law duty of good faith and fair dealing, (2) Starr did not violate the WVUTPA, and (3) genuine disputes of material fact exist "regarding Ascott's compliance with its instructions to its agent, the timing and sufficiency of [Ascott's] cooperation with the audits, and the calculation of the amount[s] due" pursuant to the policies. [ECF 59 at 2–11].

## II.

### A.    *Governing Standard*

*Federal Rule of Civil Procedure* 56 provides that summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246 (1986). "The nonmoving party must do so by offering 'sufficient proof in

7

the form of admissible evidence' rather than relying solely on the allegations of her pleadings." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ'g Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). The moving party may meet its burden of showing that no genuine issue of material fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production." *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). The Court must "view the evidence in the light most favorable to the [nonmoving] party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (internal quotation marks and citation omitted); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018).

When faced with cross-motions for summary judgment, the Court applies the above standard and must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). "The court . . . cannot weigh the evidence or make credibility determinations." *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *see Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017).

## B.    *Applicable Law*

### 1. Breach of Contract

"[T]he existence of a contract is a question of fact for the jury." *Davari v. W. Virginia Univ. Bd. of Governors*, 245 W. Va. 95, 106, 857 S.E.2d 435, 446 (2021) (citing Syl. Pt.

4, *Cook v. Heck's Inc.*, 176 W. Va. 368, 369, 342 S.E.2d 453, 454 (1986)). Whereas the determination of what constitutes a contract, and the application of an unambiguous writing present questions of law. *See Croft v. TBR, Inc.*, 222 W.Va. 224, 226–27 , 664 S.E.2d 109, 111–12 (2008) (citations omitted) ("[I]t is the province of the . . . court, and not of a jury, to interpret a written contract[.]"); *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 62, 459 S.E.2d 329, 339 n. 18 (1995) ("While the determination of what constitutes a contract . . . is a question of law, the determination of whether particular circumstances fit within the legal definition of a contract . . . is a question of fact."). "A contract is formed when the minds of the parties meet." *Brown v. Woody*, 98 W.Va. 512, 127 S.E. 325, 326 (1925).

## 2. WVUTPA

Under the WVUTPA, "[n]o person shall engage in this state in any trade practice which is defined in this article as . . . an unfair or deceptive act or practice in the business of insurance." W. Va. Code § 33-11-3. The Supreme Court of Appeals of West Virginia has held the WVUTPA's use of the term "person" gives rise to a private cause of action against employees of insurance companies who engage in conduct violating the WVUTPA. *See Taylor v. Nationwide Mut. Ins. Co.*, 214 W.Va. 324, 330, 589 S.E.2d 55, 61 (2003) (concluding "a cause of action exists in West Virginia to hold a claims adjuster employed by an insurance company personally liable for violations of the [WVUTPA]"). West Virginia Code Section 33-11-4 states pertinently as follows:

(1) *Misrepresentation and false advertising of insurance policies.* -- No person shall make, issue, circulate, or cause to be made, issued or circulated, any estimate, circular, statement, sales presentation, omission or comparison which:

(a) Misrepresents the benefits, advantages, conditions or terms of

9

any insurance policy[.]

. . .

(5) *False statements and entries.* –

(a) No person shall knowingly file with any supervisory or other public official, or knowingly make, publish, disseminate, circulate or deliver to any person, or place before the public, or knowingly cause directly or indirectly, to be made, published, disseminated, circulated, delivered to any person, or placed before the public, any false material statement of fact as to the financial condition of a person.

(b) No person shall knowingly make any false entry of a material fact in any book, report or statement of any person or knowingly omit to make a true entry of any material fact pertaining to the business of any person in any book, report or statement of such person.

W. Va. Code Ann. §§ 33-11-4(1)(a), (5)(a)–(b).

## III.

### A.    *Ascott's Common Law Bad Faith Counterclaim (Count I)*

Ascott contends Starr's conduct while seeking to recover the final premiums breached the implied covenant of good faith and fair dealing (common law bad faith) residing within the contracts between Ascott and Starr -- that is, the 2022 WC Policy and the 2023 WC Policy. [ECF 58 at 9–14; ECF 60 at 9–10]. Starr asserts West Virginia law does not contemplate an independent claim for common law bad faith claims under the circumstances presented. [ECF 59 at 2–3].

It is true West Virginia law "implies a covenant of good faith and fair dealing in every contract for purposes of evaluating a party's performance of that contract." *Hoffmaster v. Guiffrida*, 630 F. Supp. 1289, 1290 (S.D. W. Va. 1986). The Supreme Court of Appeals of West

Virginia has stated "[a]n alleged breach of the covenant of good faith and fair dealing is not a separate cause of action from a breach of contract claim." *State ex rel. Nationwide Mut. Ins. Co. v. Wilson*, 236 W. Va. 228, 231, 778 S.E.2d 677, 680 (2015). *See also Highmark W. Va., Inc. v. Jamie*, 221 W.Va. 487, 493, 655 S.E.2d 509, 514 (2007) ("[A]n implied covenant of good faith and fair dealing does not provide a cause of action apart from a breach of contract claim[.]"); *Evans v. United Bank, Inc.*, 235 W. Va. 619, 628, 775 S.E.2d 500, 509 (2015) (concluding "Petitioners' failure to allege a breach of contract was fatal to their claim for a breach of the implied covenant of good faith and fair dealing"); *Patterson v. Westfield Ins. Co.*, 516 F. Supp. 3d 557, 565 (N.D. W. Va. 2021) (citation omitted) ("West Virginia law does not, however, recognize an independent cause of action for the breach of an implied covenant of good faith and fair dealing separate and apart from a breach of contract claim.").

Inasmuch as Ascott did not allege a breach of contract claim against Starr, and West Virginia does not "recognize an independent cause of action for the breach of an implied covenant of good faith and fair dealing separate and apart from a breach of contract claim," *Patterson*, 516 F. Supp. 3d at 565, Starr is entitled to summary judgment on the common law bad faith cause of action in the counterclaim. *See Evans*, 235 W. Va. at 628, 775 S.E.2d at 509 (concluding "Petitioners' failure to allege a breach of contract was fatal to their claim for a breach of the implied covenant of good faith and fair dealing").

**B.    *Disputes of Fact***

The central questions reduce to (1) the existence of the 2023 DLP Policy, (2) whether Ascott cooperated with Starr's audits, and (3) calculation of the correct amounts due pursuant to the policies.

11

"[T]he existence of a contract is a question of fact for the jury." *Davari v. W. Virginia Univ. Bd. of Governors*, 245 W. Va. 95, 106, 857 S.E.2d 435, 446 (2021) (citing Syl. Pt. 4, *Cook v. Heck's Inc.*, 176 W. Va. 368, 342 S.E.2d 453 (1986)). The existence of the 2022 WC Policy and the 2023 WC Policy are undisputed. [*See* ECF 58 at 10 ("[T]here is no dispute that Starr and Ascott had a contract for insurance as it pertains to the 2022 WC Policy and the 2023 WC Policy."); ECF 62 at 4 (highlighting that "Ascott does not contest the issuance of the 2022 WC Policy or the 2023 WC Policy.")]. The existence of the 2023 DLP Policy, however, is disputed. [*See* ECF 60 at 7–9 (contending a genuine issue of material fact exists inasmuch as Starr issued the 2023 DLP Policy despite the "Work Comp. Renewal" language in the Client Authorization to Bind document and despite the "renewal" language in the email from USI to Starr) (quoting ECF 57-1, Ex. 3; ECF 55-10)); ECF 59 at 9 ("Ascott claims that it did not authorize USI to bind, and Starr to issue[,] the 2023 DLP Policy. . . . This is a material question of fact that cannot be decided on summary judgment.")]. Therefore, there is a genuine dispute of material fact regarding the existence of the 2023 DLP Policy.

Starr contends it is nevertheless entitled to summary judgment with respect to its breach of contract claims relating to the 2022 WC Policy and the 2023 WC Policy. Similarly, Ascott contends it is entitled to summary judgment regarding its WVUTPA counterclaim. These claims, too, however, present genuinely disputed material facts.

Regarding the audits, Starr asserts Ascott failed to provide necessary documents and information between May 2023 and early September 2023, which resulted in Starr applying the audit noncompliance charge to the 2022 WC Policy and 2023 WC Policy in September 2023. [ECF 55-14; ECF 55-19 ¶¶ 7–8; ECF 55-20; ECF 55-21]. Starr further asserts Ascott failed to submit information necessary for Starr to conduct the audit until March 2024. [ECF 55-14 ¶¶ 5–

8]. According to Ascott, however, Starr held all necessary materials after Ascott (1) previously provided financial records during the negotiation of the 2023 WC Policy, and (2) in August 2023. [ECF 57-1, Ex. 9, 10, 11, 12]. Ascott's position is that Starr, without explanation for the changing amounts, sent numerous conflicting invoices for each of the policies. [ECF 57-1, Ex. 22, 23, 24, 25, 26, 27, 28, 29; ECF 29].

   Regarding the calculation of the correct premium amounts due, Starr contends the ultimate amount for the 2022 WC Policy is $2,034,866.00 pursuant to its November 25, 2024, invoice, [ECF 55-19 ¶ 32; ECF 55–25]; the amount due for the 2023 WC Policy is $347,533.00, [ECF 55-19 ¶ 33; ECF 55-26], pursuant to its September 23, 2024, invoice; and the amount due for the 2023 DLP Policy is $102,857.01, pursuant to the September 23, 2024, invoice. [ECF 55-19 ¶ 33; ECF 55-26]. Starr further contends Ascott needs expert testimony on the correct calculations or "concrete documentation to challenge the accuracy of Starr's audits." [ECF 56 at 10; ECF 62 at 6]. Ascott notes the multiple, and conflicting, amounts Starr requested over time. [*See* ECF 57-1, Ex. 22, 23, 24, 25, 26, 27, 28, 29; ECF 29].

   Ascott has "go[ne] beyond the pleadings and . . . designate[d] specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). Regarding the 2023 DLP Policy, the Court further notes the Amended Complaint reflects differing amounts due, including $102,845.83, [ECF 29 ¶ 62], and $102,854.83, [*Id.* ¶¶ 64, 65]. Both numbers in the Amended Complaint are different from the $102,857.01 figure stated in Starr's exhibits submitted in support of its motion for summary judgment. [*See* ECF 55-19 ¶ 33; ECF 55-26]. The evidentiary record and the parties' submissions unquestionably have placed the matter beyond adjudication as a matter of law.

   Based on the foregoing discussion, Starr's Motion for Summary Judgment is

**GRANTED IN PART** and **DENIED IN PART**. [**ECF 55**]. Ascott's Motion for Partial Summary Judgment [**ECF 57**] is **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this written opinion and order to counsel of record and to any unrepresented party.

ENTER:    October 17, 2025



Frank W. Volk
Chief United States District Judge

14